## UNITED STATES BANKRUPTCY COURT

## FOR THE WESTERN DISTRICT OF MICHIGAN

IN RE:

BARIA AND SONS, LLC

      Debtor

Chapter 11
Case No.  17-00970
Hon. James W. Boyd
Filed: 03/06/2017

_____

BARIA AND SONS, LLC,

      Plaintiffs

v.

LQD BUSINESS FINANCE, LLC, GEORGE
SOURI, and DANNY SOURI

      Defendants

Adversary Proceeding No.
Hon. James W. Boyd

_____

## PLAINTIFF'S COMPLAINT

**NOW COMES** Baria and Sons, LLC (hereafter, "Baria") dba The Corner Market & Spirits (hereafter, "The Corner Market") by and through its attorneys, Oppenhuizen Law Firm, PLC, and Chase Bylenga Hulst, PLLC, and for its Complaint, states as follows:

## JURISDICTION AND VENUE

1.    Plaintiff, Baria, is the debtor in the above captioned Chapter 11 Bankruptcy proceeding.

2.    This action is an Adversary Proceeding under Fed. R. Bank. P. 7001(1), (7), (9).

3.    This adversary proceeding is in part a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Certain counts are non-core proceedings.

4.    This Adversary Proceeding, in part, arises in, arises under or relates to a Chapter 11 case, In the Matter of Baria and Sons, LLC, case no.17-00970, pending in the Bankruptcy Court for the Western District of Michigan.

1

5.   This Court has jurisdiction to hear and decide this matter under 28 U.S.C. § 1334.

6.   That venue is proper pursuant to 28 U.S.C. §1409.

7.   Debtor hereby consents to the Bankruptcy Court's entry of a final order in this matter.

## BACKGROUND

8.   In 2009, Ms. Jaswinder Kaur (hereafter, "Kaur"), formed Baria and purchased the convenience store known as The Corner Market on M 104 in Spring Lake, MI, on land contract.

9.   Kaur installed her son, Gurinder Baria (hereafter, "Ricky"), as manager of The Corner Market as Ricky had significant experience operating a convenience store. **See Exhibit 1: Affidavit of Gurinder Baria.**

10.  The store's liquor license and other licensing reflect Ricky and/or Hansneet Kaur Minhas (hereafter, "Angie"), Ricky's wife, who is also employed at the store, as managers.

11.  Between 2009 and 2014, using the revenue of The Corner Market, all required payments on the land contract were made, an addition was built, and the business was profitable.

12.  On September 3, 2014, Baria closed a loan with the Bank of Holland, which would later be assigned to Chemical Bank, in order to pay the balloon payment for approximately $500,000.00 to the land contract holder.

13.  As business continued to demonstrate growth, Angie formed two additional limited liability companies in an effort to purchase two new convenience store locations.

14.  The first limited liability company, Corner Market Shores, LLC (hereafter, "Shores"), was unable to close the sale and Shores discontinued operations.

2

15. The second limited liability company, Corner Market Ferrysburg, LLC (hereafter, "Ferrysburg"), was initially successful at reopening a second store and was working towards purchasing the business and related assets when they were unable to close the purchase.

16. The store that Ferrysburg was attempting to purchase was eventually sold to friends of Ricky and Angie, a third party.

17. On or about August, 2015, Baria was losing sales due to road construction, and in order to purchase inventory, borrowed $40,000.00 from Strategic Funding or National Business Capital, Inc. (the "Strategic Funding Loan") by virtue of the sale of accounts receivable at a substantial discount.

18. Unfortunately, this began a cycle of borrowing loans at high interest rates in order to replenish inventory.

19. In October 2015, Ricky and Angie were contacted by a representative of LQD Business Finance, LLC, (hereafter, "LQD"), named Dean Rhoades, offering to refinance several of their high interest rate loans. Angie provided the financials for the company, reflecting its profitability.

20. A short time later, Souri, the owner of LQD, and Dean Rhoades called Angie, whereby, they indicated that LQD would immediately fund a $100,000.00 loan to Baria based solely on the company's financial performance. Souri began his attempt to take over Baria at this time.

21.  LQD's first loan to Baria helped to pay off two high interest loans but charged between 30% and 52% interest. **See Exhibit 2: LQD Printout & Exhibit 3: Promissory Notes.**

22. Since the first loan, Baria has not been able to keep up on interest payments, and satisfy the business expenses of the store.

23.  LQD has systematically extended additional credit with no regard to Baria's ability to pay, or the value of Baria's assets.

24.  Every loan that has been given by LQD has named Jaswinder Kaur (as Individual Borrower), Hansneet Kaur Minhas (as Individual Borrower), Baria and Sons, LLC, Corner Market Ferrysburg, LLC, and Corner Market Shores, LLC, as borrowers (collectively, hereafter, "Borrowers").

25.  A review of the outstanding loans demonstrates that the increase in credit was targeted more at increasing the outstanding loan balances than at providing credit for business operations.

26.  Although LQD provides online access to the outstanding loans and loan histories, the actual data available is unhelpful as an amortization schedule or proving information as to where payments were applied (i.e. principal or interest).

27.  Information available online with relation to the loans provided by LQD is basic, and, upon information and belief, is intended to be vague and obscure.

28.  Several loans, which have been signed by Borrowers, are not available to review on Baria's online account with LQD.

29.  Several times, Angie and Ricky reached out to LQD regarding the high interest rates and their hampered ability to maintain payments and inventory levels.

30.  Each time, LQD responded by providing an additional loan to Baria, which acted to pay off an old note(s) while extending additional credit. Based on the limited information provided to Baria, the following loans have been given to Baria by LQD:

   a.  October 14, 2015 loan number 5000060 for $100,000 at unknown interest

   b.  October 22, 2015 loan number 5000064 for $275,000 at 52% interest

   c.  October 22, 2015 loan number unknown for $290,000 at 40% interest

    d.   December 17, 2015 loan number unknown for $20,000 at 42% interest

    e.   February 18, 2016 loan number 5000083 for $30,000 at unknown interest

    f.   March 15, 2016 loan number 5000100 for $340,000 at 42% interest

    g.   April 27, 2016 loan number 5000109 for $25,000 at 40% interest

    h.   May 26, 2016 loan number 5000114 for $40,000 at 42% interest

    i.   June 22, 2016 loan number 5000116 for $15,000 at unknown interest

    j.   July 27, 2016 loan number 5000128 for $6,000 at unknown interest

    k.   August 2, 2016 loan number 5000130 for $30,000 at 30% interest

    l.   August 2, 2016 loan number 5000132 for $18,000 at 30% interest

    m.  August 16, 2016 loan number unknown for $100,000 at 26% interest

    n.   September 1, 2016 loan number 5000138 for $350,000 at unknown interest

    o.   September 1, 2016 loan number 5000139 for $100,000 at 26% interest

31.   LQD would routinely provide a loan, set money aside out of the loan in an escrow account, and charge interest on the full amount, including the escrowed funds that Baria was never provided control of or access to.  Neither Baria, Angie, nor Ricky knew that the escrow or amount set aside existed until Brian Reshefsky (hereafter, "Reshefsky"), an employee of LQD told them in an email that there was still $21,000 in the escrow account, as the rest had been used for payments, during a period in which LQD had directed Baria, Angie and Ricky not to make payments on the loans.

32.   In August of 2016, LQD provided an additional promissory note to Baria with an agreement titled, "Assignment of Membership Interest," apparently as additional collateral for the note against Baria.

33. The Borrowers were encouraged to sign the agreement with haste since it was known that Angie and Ricky were shortly leaving on vacation and availability would be limited.

34. LQD threatened that if the agreement was not signed by the Borrowers and returned immediately, the business would be shut down, and its owners and managers removed.

35. Once signed, a company known as LQD Loans One, LLC, perfected their security interest on the first note on October 15, 2015, but LQD has not notified the Michigan Liquor License Control Commission, has not filed any changes with the State of Michigan Department of Licensing and Regulatory Affairs, has not alerted Chemical Bank and has taken no legal steps to advancing an ownership interest in Baria.

36. Supporting the fact that the "Assignment of Membership Interest" was an agreement designed to create a collateral interest is the fact that all subsequent loan documents provided to the Plaintiffs have identified Kaur as the "Owner" of Baria.  All correspondence from LQD indicated that Ms. Kaur is still the owner of the membership interest.

37. In November 2016, a representative of LQD contacted Angie and Ricky and instructed them to stop payments on the loans and focus on the holidays to increase profit.

38. Beginning almost immediately after LQD instructed Angie not to make payments during November 2016, LQD began a systematic assault on Baria.

39. LQD set in motion a plan and conspiracy directed toward converting Baria or Baria's assets to LQD's own use, for its benefit to the exclusion of any and all other creditors, employees, and the sole member of Baria.

40. On December 2, 2016, Reshefsky, the COO of LQD, contacted Angie and Ricky, via email to request a meeting.

41. On December 5, 2016, Reshefsky came to the store alone, and indicated that LQD was planning to send in consultants to assist with managing the store.

42. The consultants were to observe and make recommendations related to streamlining the store's operations.

43. Angie and Ricky refused to accept the consultants and claimed they did not need their assistance or help.

44. Reshefsky insisted that Angie and Ricky accept the consultants and pay for them, or, he claimed, LQD would show up at the store with the police and have Angie and Ricky forcibly removed.

45. On December 12, 2016, Tim Stone (hereafter, "Stone") (and an associate named Lee) of Newpoint Advisors Corporation (Schaumberg, IL) (hereafter, "Newpoint") appeared and reviewed Baria's operations for turnaround and valuation.

46. Stone prepared a report in relation to the potential to "turnaround" the store and sent it to LQD advising of his findings.

47. The efforts of Newpoint were directed toward LQD determining whether it made financial sense to try to further its plan to convert Baria's assets.

48. On December 16, 2016, Reshefsky indicated that the store would need to institute a new point-of-sale system (hereafter, "POS"), which would also be used for effectuating sale transactions, cash management, and inventory.

49. The new point-of-sale systems recommended by Reshefsky – one that was licensed to Newpoint by EPOS -  was not designed for use in retail stores.

50. Angie and Ricky expressed their aversion to paying for the Newpoint system as the POS system's inability to properly read bar codes and charge customers for craft beer purchases

as well as the inventory control system's failure to properly maintain correct information hampers the store's accounting, sales and decreases revenue.

51. Without Baria's agreement, the POS system was shipped to The Corner Market, and Baria was told by LQD it needed to implement the POS system immediately.

52. Angie and Ricky objected to the system, again, but did not believe they had any recourse, and continued as instructed by LQD.

53. Baria was subsequently charged for the Newpoint systems, and LQD has demanded on multiple occasions that the Borrowers sign yet another Promissory Note to cover costs associated with the POS System and other unnecessary expenses

54. Stone then informed Angie and Ricky that they were not to pay themselves, and began controlling the inventory purchases, and overseeing cash use of The Corner Market.

55. Stone further informed Angie and Ricky that they were not permitted to pay business or property insurance.

56. Angie paid the insurance on the commercial property and its general liability insurance from personal funds, out of concern for the lack of insurance as well as the default that would cause in relation to Debtor's primary mortgage holder, Chemical Bank.

57. On January 3, 2017, Reshefsky informed Angie and Ricky that they must use their systems to build a database of their inventory for Newpoint to better track ongoing business.

58. Being uninformed, again, Angie and Ricky believed they had no choice in the matter and allowed Newpoint to build a database of their inventory with the information required by LQD.

59. On February 15, 2017, Stone and Reshefsky met Angie and Ricky at Applebee's in Grand Haven, MI, where they were instructed to walk away from the store, and let LQD liquidate the assets.

60. In exchange, LQD stated it would not pursue the personal liabilities on the debts owed.

61. Alternatively, Angie and Ricky could sell the store to LQD for the face value of the promissory notes, and then purchase it from LQD for actual current market value.

62. Stone and Reshefsky also indicated that if Angie and Ricky did not choose either of those options, LQD would install a manager, and force the changes that LQD deemed appropriate.

63. On February 20, 2017, Stone texted Angie and indicated that someone named Dan or Danny Souri AKA "Freaky D," (hereafter, "Freaky D") and Stone would be coming to the store on February 21, 2017.

64. Freaky D, the cousin of LQD's owner, appeared on February 21, 2017, and asserted that he had a court order requiring he take control of the Store.

65. No such order exists, as was later indicated by Stone.

66. Angie and Ricky initially resisted the attempted hostile takeover and were informed by George Souri (hereafter, "Souri"), LQD's owner, that if they did not allow Freaky D into the building, the sheriff would be called and subsequently have them arrested.

67. Freaky D appeared at the store every day from February 21, 2017 until March 4, 2017, wearing dirty clothes, smelling of marijuana, and looking disheveled.

68. Freaky D has been running The Corner Market as an alleged acting manager since February 21, 2017 and has shown in two short weeks that he is unfit and unqualified to operate Baria.

69. Freaky D is unpredictable, volatile, offensive to customers and staff, and is potentially harmful.

70. Since his time running the store, he routinely conceals and carries a handgun for which he has no Michigan Concealed Pistol License, routinely uses vulgar and offensive language, brags about his involvement with adult entertainment venues, has sexually harassed customers, and threatened staff.

71. Besides his personally offensive behavior, Freaky D has either by himself or at the direction to LQD, made several reckless business decisions, including:

    a. Instructing Angie and Ricky to default on their mortgage obligations with Chemical Bank

    b. Refusing to pay insurance premiums

    c. Not charging the properly listed prices in the sale of alcohol

    d. Ordered products simply to obtain promotional materials

    e. Routinely every night, Freaky D takes cash out of the register without disclosing or taking a proper accounting of the funds

72. On February 21, 2017, Freaky D has replaced the merchant services credit card machines, and directed all of the funds from credit card sales be directed into a new bank account that Baria does not have access to.

73. The account where the money earned from the gross sales by Baria is deposited appears to be owned by Freaky D, individually.

74. Freaky D also removes nearly all of the cash from the registers at the end of the night; it is entirely unknown what Freaky D does with the cash that is removed from the store. The brief account history in the possession of Debtor reflects no cash deposits into the Fifth Third Bank account.

75. Freaky D, as agent for LQD or on his own, converts Baria's gross revenue on a daily basis, and has each day between February 21, 2017 and March 4, 2017.

76. Plaintiffs cannot currently account for its income and expenses between February 21, 2017 and March 4, 2017 as a result of Dan Souri and / or LQD's conversion of all of its operating revenue.

77. Gross revenues between February 21, 2017 and March 4, 2017 is thought to total $39,182.28 based upon the POS System.

78. Despite Baria's concerns and notice to LQD of violations of applicable Michigan laws, no affirmative acts have been taken to remedy the situation.

79. Freaky D was asked to leave the property by counsel for Debtor on March 6, 2017.  The Ottawa County Sheriff was informed of the trespass, and was at the scene.  The Sheriff removed Freaky D to the parking lot, and indicated that he would be required to take a taxi to his hotel, and his vehicle would be towed, because Freaky D's driver's license was suspended.  The Ottawa County Sheriff determined that some behavior was suspicious and searched Freaky D.  The search turned up illegally possessed drugs and a firearm, and Freaky D was arrested in front of The Corner Market on two felony charges and one misdemeanor charge.

80. LQD saw fit to endanger Baria's business by attempting to impose Freaky D upon Baria.

## COUNT 1 – COMMON LAW CONVERSION

81. Plaintiff incorporates the above allegations as though fully stated herein.

82. The tort of conversion is any distinct act of dominion wrongfully exerted over another person's personal property in denial of, or inconsistent with the rights therein.

83. Baria at all relevant times prior to February 21, 2017, maintained the revenues and profits from the operation of The Corner Market.

84. In the ordinary course of business, Baria deposited funds from the operation of The Corner Market into an account at JPMorgan Chase Bank, which was linked to their merchant services account and known by the Michigan Liquor License Control Board to monitor taxes on the sale of alcohol.

85. Baria at no time authorized LQD to install their own manager, separate merchant services account, or to take proceeds from the operation of The Corner Market, and direct them into an account of their own.  LQD never obtained a court order permitting such activities.

86. Baria has repeatedly, both orally and in writing, demanded that the funds from the operation of The Corner Market be deposited into such accounts as is typical in the ordinary course of business so that vendors, creditors, and all relevant parties could maintain lawful operation of The Corner Market.

87. LQD, Souri, or Freaky D has not allowed Baria to review the accounting records and demands full control of the revenues from The Corner Market.

88. In addition to LQD's conduct with regard to the funds from credit/debit card transactions, upon information and belief, Defendant Freaky D routinely removed cash from the register of The Corner Market and used it for his personal use, and / or uses inconsistent with Baria's rights to the property.

89. Upon information and belief, both LQD and Freaky D have unlawfully taken and asserted dominion and control over a minimum of $39,182.28 in revenues from The Corner Market, which rightfully belong to Baria.

90. The acts described above constitute an unlawful conversion of Baria's property, resulting in damages to Baria in an amount of at least $39,182.28 but may be more as the exact value, due to the segregation of funds from the time Freaky D was installed as manager of The Corner Market by LQD, is unknown.

**WHEREFORE**, Plaintiff requests that this Court enter judgments in their favor and against Defendants, in an amount for their damages, reasonable attorney's fees, costs, plus pre-judgment interest, post judgment interest, and such further relief.

## COUNT 2 – STATUTORY CONVERSION

91. Plaintiff incorporates the above allegations as though fully stated herein.

92. Under MCL 600.2919(a)(1), "A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees: (a) Another person's stealing or embezzling property or converting property to the other person's own use…A person who has been damaged as a result of statutory conversion may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney's fees."

93. From February 21, 2017, to March 4, 2017, LQD had changed merchant services accounts and installed credit card readers to The Corner Market in order to divert revenues to an account other than the one set up for Baria.

94. All revenues from February 21, 2017, to March 4, 2017, were not accessible or made available to Baria.

95. LQD, Souri and Freaky D did not pay, provide cash to, or allow Baria to use The Corner Market revenues for any purposes and, upon information and belief, applied all funds to their own accounts.

96. The actions taken by LQD and Freaky D (at the direction of Souri) in directing the revenues of The Corner Market demonstrate a scheme intended to take control of The Corner Market's operations and cash flow for their own use.

97. The actions taken by LQD, Souri, or Freaky D in removing cash from the register, and using for some purpose personal to his interests constitutes statutory conversion as both stealing and/or embezzlement.

98. As a direct and proximate result of Defendant's statutory conversion, Plaintiffs have suffered substantial economic injury, in the minimum amount of $39,182.28 and are entitled to treble damages, and to recover attorney fees and costs.

**WHEREFORE**, Plaintiff requests that this Court enter judgments in their favor against Defendants, in an amount for treble damages, reasonable attorney's fees, costs, plus pre-judgment interest, post judgment interest, and such further relief.

## COUNT 3 – CIVIL CONSPIRACY

99. Plaintiff incorporates the above allegations as though fully stated herein.

100. Defendants have combined efforts and engaged in concerted activities to accomplish an unlawful purpose and/or to accomplish a lawful purpose by unlawful means, which brought about damage to Baria.

101. Defendant's unlawful purposes and actions include the tortious and oppressive conduct in overtaking The Corner Market as described above.

102. Baria has suffered damages as a result of the Defendants' civil conspiracy.

103. Defendants are jointly and severally liable for Plaintiff's damages.

**WHEREFORE**, Plaintiff requests that this Court enter judgments in their favor against Defendants, disgorging all fees retained by Defendants and also in an amount for their damages,

14

reasonable attorney's fees, costs, plus pre-judgment interest, post judgment interest, and such further relief.

### COUNT 4 – TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

104.  Plaintiff incorporates the above allegations as though fully stated herein.

105.  The elements of tortious interference with a business relationship are: (1) the existence of a valid business relationship or expectancy (not necessarily an enforceable contract); (2) the interferer's knowledge of the relationship or expectancy; (3) an intentional interference by an illegal, an unethical, or a fraudulent act that breaches or terminates the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted.

106.  From October 2015 to March 2017, LQD continuously pressured Baria to refinance the commercial loans being held by LQD with threats of default, and the taking of Baria's business for LQD's purposes.

107.  The additional loans that were signed by Baria provided LQD with the leverage it believed was necessary to install its own manager and continue its efforts at a hostile takeover of The Corner Market.

108.  The manager LQD chose to insert at The Corner Market, Freaky D, as stated above, directed proceeds from the operations of The Corner Market into an account owned by Freaky D or LQD.

109.  Any and all sales from the operations of The Corner Market from February 21, 2017 until March 4, 2017 have not been accounted for and make it impossible to pay vendors and the Michigan Liquor Control Board for applicable sales taxes on the sale of alcohol.

110.  LQD and Freaky D's removal of access to revenues and proof of sales has put Baria in jeopardy of losing their liquor license through the State of Michigan.

111. LQD's actions in overtaking managerial authority of the store has also put Baria in jeopardy of foreclosure by commercial mortgage holder, Chemical Bank.

112. In addition to LQD's interference with the ordinary course of business, Freaky D advised the Angie and Ricky several times not to pay their commercial mortgage or Baria's liability insurance as money was needed to be paid in towards LQD's outstanding loans.

113. Freaky D did not continue the ordinary course of payroll and paid Ricky and Angie one lump sum, in cash, of $600 for the work done in the store from February 21, 2017 to March 4, 2017, knowing that both Angie and Ricky contributed more than 40 hours/week of work during that period of time.

114. Freaky D also paid Baria's additional employee an amount in cash that equated to less than $5.00/hour for the work at The Corner Market during February 21, 2017 to March 4, 2017.

115. Defendants knew of the business relationships and expectancies between Plaintiffs, it's customers, vendors, employees, and creditors.

116. Defendants were told both verbally and in writing that a divestiture of funds into their bank accounts would lead to serious issues with both the Michigan Liquor Control Commission as well as Chemical Bank.

117. LQD's conduct and the conduct of Freaky D were directed toward making it unbearable for Ricky and Angie to continue working for Baria, and choose to surrender the store to LQD, so LQD could profit.  A significant part of the scheme was harming each of Baria's business relationships, contracts, and expectancies.

118. By such conduct, as set forth above, Defendants intentionally, improperly, and tortiously interfered with the business relationships and expectancies between Baria, its vendors, creditors, employees, and customers.

16

119. That Defendants actions, as set forth above, were intended to, and did, interfere with the above referenced business relationships and expectancies causing economic loss to Baria.

120. As a direct and proximate result of Defendant's wrongful conduct, Baria has suffered substantial economic injury.

**WHEREFORE**, Plaintiff requests that this Court enter judgments in their favor against Defendants, in an amount for their damages, plus pre-judgment interest, post judgment interest, and such further relief.

## COUNT 5 – UNJUST ENRICHMENT

121. Baria incorporates the above allegations as though fully stated herein.

122. Unjust enrichment has two key elements: (1) the receipt of a benefit by the wrongdoer; and (2) a finding that it would be inequitable for the wrongdoer to retain it.

123. Defendants received the benefit of Baria's business revenues above each and every vendor, creditor, employee, or taxing authority by installing merchant services software to filter revenues to a private bank account within their control.

124. Freaky D emptied the cash register at the close of business each night and it is unclear what he did with the cash (particularly in light of his arrest), thereby receiving funds that rightfully belong to Baria.

125. Defendants have been unjustly enriched to Baria's detriment by converting funds from the operations of The Corner Market, and applying funds towards their outstanding loan and self-interests.

126. Defendants have been unjustly enriched to Baria's detriment by converting funds from the operations of The Corner Market, and using those funds to pay and benefit Freaky D.

127. Defendants will be unjustly enriched to Baria's detriment by receipt of all gross revenues from the operation of The Corner Market, if allowed to continue their corporate takeover strategies.

128. An inequity has resulted to Baria because of Defendant's retention of revenues since store expenses are not being paid and Plaintiff has not been able to use or control funds belonging to The Corner Market.

**WHEREFORE**, Plaintiff requests that this Court enter judgments in their favor against Defendants, in an amount for their damages while disgorging funds received from Baria, while awarding reasonable attorney's fees, costs, plus pre-judgment interest, post judgment interest, and such further relief.

## <u>COUNT 6 – FRAUDULENT MISREPRESENTATION</u>

129. Plaintiff incorporates the above allegations as though fully stated herein.

130. For a claim of common law fraudulent misrepresentation in a business context, the plaintiff is required to show the defendant: (1) made a material representation; (2) the representation was false; (3) the defendant knew it was false when it was made or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the representation was made with the intention to induce reliance by the plaintiff; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered injury.

131. LQD, Souri, and Freaky D have made multiple material representations to Baria, including but not limited to: the necessity of Baria to continue to utilize high interest rate loans through LQD as default was imminent, the ability of LQD to overtake the store if additional loans were not signed, the necessity of Newpoint and the payment of their fees, and for hardware and software, the purpose of the loans being for continuing business operations while not

18

providing full loan payouts or amortizations, and the legal authority of LQD to enter The Corner Market with a signed court order.

132. The representations made by LQD, Souri, and Freaky D were false.

133. When LQD, Souri, and Freaky D made the representations to Baria, they knew the representations were false or made them recklessly, without knowledge of their truth as a positive assertion.

134. LQD, Souri, and Freaky D made these false representations with the intention to induce reliance by Baria, Angie, and Ricky.

135. Baria acted in reliance on the material false representations and the fear that such false representations created by allowing LQD and Freaky D to access store financials, control their inventory, cash, and credit card terminals as well as to incur additional debts with LQD for operation of The Corner Market.

136. Baria suffered damages as a result of their reliance on the false representations and are entitled to damages, plus pre-judgment interest, post judgment interest, and such further relief.

**WHEREFORE**, Plaintiff requests that this Court enter judgments in their favor against Defendants, in an amount for their damages, reasonable attorney's fees, costs, plus pre-judgment interest, post judgment interest, and such further relief.

### COUNT 7 – USURY PURSUANT TO ILLINOIS INTEREST ACT

137. Plaintiff incorporates the above allegations as though fully stated herein.

138. The Illinois Interest Act, 815 Ill. Comp. Stat. 205/4, states that the maximum rate to be charged in Illinois is generally 9%.

139. Exceptions to the 9% cap exist and include "any business loan…to a person owning and operating a business as a sole proprietor."

140. Angie, who has is identified as an individual borrower in all loan documents, is not an owner of Baria.

141. The Act also states that, "any loan which is secured…by an assignment of an individual obligor's salary, wages, commissions, or other compensation for services…shall be deemed not to be a loan within the meaning of this subsection [exempting business and other loans from the 9% cap]…"

142. Every loan given by the LQD to Baria has named Kaur and Angie as individual borrowers.

143. Paragraph 9 of each and every loan given by LQD to Baria state that the Lender, LQD, is granted, "a lien on and security interest in, and acknowledges and agrees that the Lender has and shall continue to have a continuing lien on and security interest in all right, title and interest of any of the Borrowers in all of each Borrower's assets and all products or proceeds thereof, whether now owned or existing or hereafter created, acquired, or arising"

144. LQD has violated the 9% statutory interest rate cap of individuals by providing loans to individual borrowers and taking a secured interest in the borrowers' salary, wages, commissions, or other compensation for their services.

**WHEREFORE**, Plaintiff requests that this Court enter judgments in their favor against Defendants, in an amount equal to twice the total of all interest, discount and charges determined by the loan contract or paid by the obligor, whichever is greater plus reasonable attorney's fees and court costs as may be assessed against the lender.

## COUNT 8 – DECLARATORY JUDGMENT DECLARING ASSIGNMENT NULL AND VOID

145. Plaintiff incorporates the above allegations as though fully stated herein.

146. An action for declaratory judgment is a successful endeavor when four elements have been met: (1) there is an actual and justiciable controversy between the parties, even if no actual injuries or losses have yet occurred; (2) the location is within the court's jurisdiction; (3) a present adjudication of the controversy is necessary to guide the plaintiff's future conduct and preserve trial relief; and (4) declaratory relief will avoid a multiplicity of actions at law or avoid potential conflicts between the parties.

147. On August 1, 2016, LQD and Souri required Kaur to sign an "Assignment of Membership Units," (hereafter, "Assignment") in order to induce LQD to extend additional credit. **See Exhibit 4: Assignment.**

148. Souri and LQD explained to Borrowers that the Assignment was necessary because they were in default or very near default on their outstanding loans.

149. LQD and Souri never provided Borrowers with notice of default nor provided an accounting or amortization detailing the default.

150. The Assignment purports to transfer to LQD, an outstanding creditor of Baria, the membership interests in Baria so that additional financing *may* be extended.

151. If LQD was of the honest belief they owned Baria, there would be no need or want for additional credit as Baria would not be under Kaur's control.

152. On August 2, 2016, LQD sent additional loan documentation to the Borrowers, which specifically identified Kaur as "Owner" of Baria on the signature pages.

153. Since August 1, 2016, six separate loans have been offered to the Borrowers; all of which have identified Kaur as "Owner" of Baria.

154. LQD has taken no affirmative steps with the State of Michigan's Department of Licensing and Regulatory Affairs to register their change of ownership.

21

155. LQD has taken no affirmative steps with the State of Michigan's Liquor Control Commission to alert them of a change of ownership.

156. LQD has taken no affirmative steps with Chemical Bank to make them aware of any change or ownership.

157. LQD's Assignment is merely a tool and designed as a scheme to further their efforts at overtaking a profitable business for personal gain.

158. LQD, however, has inserted Freaky D as manager of The Corner Market, and has taken complete control of all financial accounts and records while still retaining Angie and Ricky in the same or substantially the same capacity.

159. LQD also refers to Kaur as the sole Owner of Baria and required her signature on all loan documents, even those given after the Assignment was signed.

160. The Assignment and the actions taken by LQD do not suggest a legal ownership interest in Baria by anyone other than Kaur.

161. The Assignment should be rendered null and void as it is nothing more than a security interest in Baria's operations and was provided only after a purported default or potential default that was never identified.

162. This court has power to adjudicate the matters at issue and enter a judgment declaring the rights of all parties to this action.

163. It is necessary for this court to adjudicate and declare the rights of the parties to the membership interest of Baria and to preserve the legal rights of the parties.

164. In order to prevent a manifest injustice, Plaintiff also seeks injunctive relief pending the final requested Declaratory Judgment enjoining LQD from taking any action to effectuate the Assignment, to collect the debts against Angie or Kaur, as the amount and legitimacy of the

debt are in question.  Plaintiff is filing, along with this complaint a motion for temporary restraining order.

**WHEREFORE**, Plaintiff requests that this Court enter a declaratory judgment rendering the Assignment void and Kaur as the legal owner of Baria in order to allow vendors, Chemical Bank, and all creditors to be paid out of the proceeds of Baria instead of to the sole benefit of LQD.

## COUNT 9 – AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548

165.  Plaintiff incorporates the above allegations as though fully stated herein.

166.  Under 11 U.S.C. §548, the Debtor in Possession can avoid fraudulent transfers.

167.  To avoid a fraudulent transfer under 11 U.S.C. §548, the Debtor in Possession must demonstrate the following elements: (1) a transfer, either voluntary or involuntary, of the debtor's property or an interest therein (including the incurring of an obligation by a debtor) made or incurred by the debtor within 2 years before the date of the filing of the petition; and (a) made or incurred with actual intent to hinder, delay, or defraud a creditor of the debtor; or (b) for which the debtor received less than reasonably equivalent value; and (I) was insolvent when the transfer was made or rendered insolvent; or (II) the debtor was engaged in business for which the debtor's remaining property represented an unreasonably small capital…

168.  Freaky D, as being installed as manager of The Corner Market by LQD, routinely took cash from the register and deposited all funds into an account owned by Freaky D or LQD.

169.  All funds from sales at The Corner Market from February 21, 2017 to March 4, 2017, have been taken from Baria and deposited into a separate account to the detriment of creditors.

170. The transfers of funds from Baria's operations constitute all transfers to or for the benefit of LQD, Souri, or Freaky D, which Baria has been able to identify as of the date of this Complaint.

171. Each transfer of funds from the operations of The Corner Market into accounts owned by Freaky D, Souri, or LQD constitute fraudulent transfers pursuant to 11 U.S.C. §548.

172. Each transfer was intended to hinder, delay, or defraud creditors as LQD and Freaky D converted all the funds from The Corner Market's operations.

173. Each transfer took place while Baria's remaining inventory was dwindling and The Corner Market was essentially operating solely to pay LQD and Freaky D.

174. At the time of each Transfer, Baria was engaged in a business or a transaction for which the remaining assets of Baria were unreasonably small in relation to the business or transaction.

175. Each Transfer took place while Baria was insolvent or Baria became insolvent shortly after and as a result of one or more of the Transfers was made.

176. In total, the gross sales from February 21, 2017, to March 4, 2017 of $39,182.28 was transferred to either LQD, Souri, and/or Freaky D.

177. Further, to the extent that payments made to LQD cannot be shown to have been applied appropriately to the respective loans, each such instance would be an additional instance of fraudulent transfer.  Accordingly, Plaintiff will seek, through discovery, to determine whether additional fraudulent transfers took place and whether additional damages should be sought.

**WHEREFORE**, Plaintiff requests that this Court enter judgments in their favor against Defendants, in an amount for their damages, while avoiding all transfers unlawfully retained by

Defendants, reasonable attorney's fees, costs, plus pre-judgment interest, post judgment interest, and such further relief.

## COUNT 10 – RECOVERY OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § 550

178. Plaintiff incorporates the above allegations as though fully stated herein.

179. Per 11 U.S.C. § 550(a), to the extent that a transfer is avoidable under 11 U.S.C. § 548, the Debtor in Possession may recover, for the benefit of the estate, the property transferred, or in the alternative, the value of such property.

180. Upon avoidance of the Transfers (hereafter "Avoided Transfers"), Baria is entitled to recover the property transferred or the value of the Avoided Transfers from LQD, Souri, and Freaky D of each Avoided Transfer or the person for whose benefit each Avoided Transfer was made pursuant to 11 U.S.C. § 550(a)(1).

**WHEREFORE**, Plaintiff requests this court enter a Judgment in their favor against Defendants, in an amount for their damages, while recovering the value of all transfers unlawfully retained by Defendants, reasonable attorney's fees, costs, plus pre-judgment interest, post judgment interest, and such further relief.

Date: March 7, 2017                         Respectfully submitted,

                                            CHASE BYLENGA HULST, PLLC
                                            Proposed Co-Counsel for Debtor

                                            /s/  *Michael P. Hanrahan*
                                            Michael P. Hanrahan (P77274)
                                            Steven M. Bylenga (P73492)
                                            Dan E. Bylenga (P32154)
                                            Chase Bylenga Hulst, PLLC
                                            25 Division Ave., SE, Suite 500
                                            Grand Rapids, MI 49503

Date: March 7, 2017                         /s/*James R. Oppenhuizen*
                                            James R. Oppenhuizen (P68715)

Oppenhuizen Law Firm, PLC
125 Ottawa Ave. NW, Suite 366
Grand Rapids, MI 49503
616-730-1861
joppenhuizen@oppenhuizenlaw.com